RECORD NO. 14-1660 (L)

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

JASON KLEIN, individually,
on behalf of all others similarly situated,

*Plaintiff-Appellant,*

v.

VERIZON COMMUNICATIONS, INC., VERIZON
ONLINE LLC, and VERIZON MARYLAND,

*Defendants-Appellees.*

### OPENING BRIEF OF PLAINTIFF-APPELLANT

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

Raymond Charles Fay, Esq.
FAY LAW GROUP PLLC
Suite 200
1250 Connecticut Avenue, NW
Washington, DC 20036
(202) 263-4604 (Telephone)
rfay@faylawdc.com

   Counsel for Plaintiff-Appellant
   Jason Klein

The Appellate Link  •  1011 E. Main Street, Richmond, VA 23219  •  (804) 698-9471

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☐NO


2.    Does party/amicus have any parent corporations?    ☐YES ☐NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☐NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☐NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☐NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____    _____
(signature)                             (date)

- 2 -

# TABLE OF CONTENTS

**Page**

Jurisdictional Statement ……………………………………………………1

Statement of Issues Presented for Review…………………………………2

Statement of the Case………………………………………………………3

Statement of Facts…………………………………………………………4

    1.    Klein's Subscription to Bundled Services, Termination of DSL Service, and Second Subscription to Bundled Services……………..4

    2.    The 2010 and 2011 Terms of Service……………………………..6

        a.  Early Termination Fee………………………………………..6

        b.  Verizon's Ability to Revise the Terms of Service Prospectively..7

        c.  Choice of Law: Selecting Virginia Law and the Survival Clause.7

    3.    Verizon's Unilateral Modification of the 2011 Terms of Service……8

        a.  Email of the Browsewrap Notification of the New Terms of Service…………………………………………………………..8

        b.  The 2012 TOS…………………………………………………9

Summary of Argument………………………………………………………11

Argument……………………………………………………………………14

I.    Standard of Review………………………………………………...14

II.    In Determining Whether the Parties Agreed to Arbitrate, the District Court Erred in Applying Maryland Rather Than Virginia Law, and Erred in Applying a Presumption in Favor of Arbitration…………………………..14

A.    The District Court Ignored the Choice of Law Provision In the Terms of Service and Incorrectly Applied Maryland Rather Than Virginia Law................................................14

B.    The District Court Incorrectly Applied a Presumption in Favor of Arbitration in Deciding That the Parties Had Agreed to Arbitrate....................................................17

III.   The District Court Erred By Finding That Klein's Silence and Continued Use of the Verizon Service Were Sufficient to Assent to the 2012 TOS ....21

A. General Contract Principles Preclude a Finding of Assent to the 2012 TOS....................................................21

B. The Law that Has Developed in the Internet Context Precludes a Finding of Assent....................................................23

IV.   The District Court Erred When It Applied the 2012 TOS Retroactively and Considered the 2012 TOS as a Valid Modification to the Terminated 2010 TOS....................................................31

A. The District Erred By Failing to Apply the Plain Language of the 2010 Terms of Service Which Limited Any Modifications to Prospective Application Only....................................................32

B. The Court's Reading of the Arbitration Clause to Permit Retroactive Application Renders the Agreement Illusory and Unenforceable....................................................36

C. The 2010 TOS Had Been Terminated and Could Not Then Be Modified, As the 2012 TOS Uses Limiting, Present Tense Language....................................................43

1.  Klein's 2010 TOS Had Been Terminated in March 2011..43

2.  The Language of the 2012 TOS Limited Its Application to the Existing TOS....................................................44

Conclusion....................................................48

# TABLE OF AUTHORITIES

## FEDERAL CASES                                                    Page

*Arrants v. Buck,* 130 F.3d 636 (4th Cir.1997)………………………….……………18

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009)………………………….....19

*AvePoint Inc. v. Power Tools, Inc.,* Civil Action No. 7:13CV00035, 2013 WL
    5963034 (W.D.Va. Nov. 7, 2013)……………………………...……...26-30

*Bailey v. Fed. Nat'l Mortgage Ass'n*, 209 F.3d 740 (D.C. Cir. 2000)……………22

*Brown v. Trans World Airlines*, 127 F.3d 337 (4th Cir. 1997)……………………18

*Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566
    (4th Cir. 1998)……………………………………………………….14, 32-34

*Carson v. Giant Food, Inc.*, 175 F.3d 325 (4th Cir. 1999)……………………….....19

*CoStar Realty Info. v. Field,* 612 F. Supp. 2d 660 (D. Md. 2009)…………...25, 26

*Cvent, Inc. v. Eventbrite, Inc.,* 739 F.Supp.2d 927 (E.D.Va.2010)…………...….27-29

*Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002)………..………….….36

*Equal Emp't Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279 (2002)…18

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)………………….....19

*Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000)………..36

*Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368 (1974)………..18

*Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527
    (E.D. Va. 1999)……………………………………………….……18, 23, 34, 35, 47

*Harold H. Higgins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696 (D. Md. 2008)15

*Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999).............16

*Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999).......................37

Karnette v. Wolpoff & Abramson, L.L.P., 444 F. Supp. 2d 640 (E.D. Va. 2006).19

*Kraft Real Estate Investments LLC v. Homeaway.com*, Civil Action
    No. 4:08–CV–3788, 2012 WL 220271 (D.S.C. Jan. 24, 2012)...........28, 30

*Levin v. Alms Assocs., Inc.*, 634 F.3d 260 (4th Cir. 2011).....................20, 32-35

*Long v. Fid. Water Sys., Inc.*, 2000 U.S. Dist. LEXIS 7827
    (N.D. Cal. May 24, 2000)...................................................................42

*Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008)....................36-38, 40

*Myers v. MBNA Am. & N. Am. Capitol Corp.*, 2001 U.S. Dist. LEXIS 11900
    (D. Mont. Mar. 28, 2001)...............................................................22, 42

*Parkerson v. Fed. Home Life Ins. Co.*, 797 F. Supp. 1308 (E.D. Va. 1992).........23

*Perry v. Fleetboston Fin. Corp.*, 2004 U.S. Dist. LEXIS 12616
    (E.D. Pa. July 6, 2004)..................................................................15, 43

*Rensin v. Juno–Loudon, LLC*, No. 09cv1391, 2010 WL 1381546
    (E.D.Va. Mar. 30, 2010)..................................................................47

*Security Watch, Inc. v. Sentinel Sys.*, 176 F.3d 369 (6th Cir. 1999)..............44

*Southwest Airlines Co. v. BoardFirst, LLC*, No. 3:06-cv-0891,
    2007 WL 4823761 (N.D. Tex. Sept. 12, 2007)................................26

*Specht v. Netscape Commc'n Corp.*, 306 F.3d 17 (2d Cir. 2002).......12, 24, 26, 27

*Stone v. Golden Wexler & Sarnese, Prof'l Corp.*, 341 F. Supp. 2d 189
    (E.D.N.Y. 2004)...........................................................................42

*Suburban Leisure Ctr., Inc. v. Amf Bowling Prods.*,
    468 F.3d 523 (8th Cir. 2006)..........................................................44

iv

*Sys. Research & Applications Corp. v. Rhode & Schwarz Federal Sys., Inc.,*
    840 F. Supp.2d 935 (E.D. Va. 2012)……………….…………………………18

*United States v. Bankers Ins. Co.,* 245 F.3d 315 (4th Cir. 2001)………..……...…..14

*United States v. Wilson,* 503 U.S. 329 (1992)……………………………………..47

*Verizon Advanced Data, Inc. v. Frognet, Inc.,* No. 2:05-cv-955
    2006 U.S. Dist. LEXIS 57223 (S.D. Ohio Aug. 14, 2006)………...34, 35, 44

## STATE CASES

*Badie v. Bank of Am.,* 67 Cal. App. 4th 779, 79 Cal. Rptr. 2d 273 (1998)………..42

*Berry v. Klinger,* 225 Va. 201, 300 S.E.2d 792 (1983)…………………………16, 46

*Black v. Powers*, 628 S.E.2d 546 (Va. Ct. App. 2006)……………………………16

*Cheek v. United Healthcare of the Mid- Atl., Inc.*, 378 Md. 139 (Md. 2003)…….38

*Cheney v. Bell National Life,* 315 Md. 761, 556 A.2d 1135 (1989)………………46

*C.I.T. Corp. v. Guy*, 170 Va. 16 (Va. 1938)……………………………………....15

*Discover Bank v. Shea,* 362 N.J. Super. 200, 827 A.2d 358
    (N.J. Super. Ct. 2001)……………………………………………………42

*Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 519 S.E.2d 133 (1999)…...19, 46

*Emp'rs Comm. Union Ins. Co. of Am. v. Great Am. Ins. Co.,* 214 Va. 410,
    200 S.E.2d 560 (1973)……………………………………………………...23

*Peleg v. Neiman Marcus Group, Inc.*, 204 Cal. App. 4th 1425
    (Cal. App. 2d Dist. 2012)……………………………..…………………37

*Powell Mountain Joint Venture v. Moore*, 248 Va. 63 (1994)……………………21

*Sears Roebuck & Co. v. Avery*, 593 S.E.2d 424 (N.C. Ct. App. 2004)…………..42

v

*Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68 (1983)……………………21, 22

*Tate v. Hain*, 181 Va. 402, 25 S.E.2d 321 (Va. 1943)………………………………16

*Union Planters Bank, N.A. v. Rogers*, 912 So. 2d 116 (Miss. 2005)……………...22

*Warren v. Goodrich*, 133 Va. 366 (1922)…………………………………………22

*Weekley Homes, LP v. Rao,* 336 S.W.3d 413 (Tex. App. 2011)…………………43

## MISC. SOURCES

Rest. (Second) of Contracts §206 cmt. a (1981)…………………………………..20

CORBIN ON CONTRACTS § 3.18 (1993 & Supp. Fall 2000)……………........23

2 FARNSWORTH ON CONTRACTS § 7.3……………………………………..44

Mark A. Lemley, *Terms of Use,* 91 Minn. L.Rev. 459 (2006)……...…………30-31

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), conferring jurisdiction on the federal courts for any class action in which any member of the plaintiff class is a citizen of a state (here Maryland) diverse from the defendant (here either Delaware or New York), and in which the amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. This matter also meets the requirements of 28 U.S.C. § 1332(d)(5) on the basis that more than two-thirds of the members of the proposed nationwide class are citizens of states other than Virginia, where the case was filed, and that the total number of class members will exceed 100.

Appellate jurisdiction of this Court is conferred by 28 U.S.C. § 1291. This appeal was taken from the district court's entry of a final judgment on June 18, 2014 (A. 252), that disposed of all of Klein's claims. Klein filed a Notice of Appeal on July 1, 2014, thereby establishing the timeliness of this appeal.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The district court applied Maryland law to determine whether Verizon's unilateral change to the 2011 Terms of Service in 2012 to require arbitration was a valid contract modification to the 2010 Terms of Service. The 2010 Terms of Service had terminated in 2011, when Klein terminated service and incurred the contested early termination fee (ETF). The 2010 and 2011 Terms of Service expressly stated that the substantive laws of Virginia governed the rights and duties of the parties. The issues presented for review are:

    1.    Whether, in determining whether the parties agreed to arbitrate, the district court incorrectly applied Maryland law instead of Virginia law, and incorrectly applied a presumption in favor of arbitration.

    2.    Whether Verizon's unilateral addition of a mandatory arbitration clause failed as a valid contract modification under Virginia law, where Verizon sent notification of the new terms via email and Klein did not assent to it.

    3.    Whether the district court erred in finding that, where the parties entered into two separate contracts in 2010 and 2011—the first of which was terminated, giving rise to Klein's claims and ending the relationship between the parties for a definite period of time—a modification in 2012 to the terms of the 2011 contract applied to Klein's claims arising under the 2010 contract.

## STATEMENT OF THE CASE

Plaintiff-Appellant Jason Klein ("Klein") brought this action in July 2012 in the Eastern District of Virginia challenging the imposition of a $135 Early Termination Fee ("ETF") by Defendants-Appellees Verizon Communications, Inc. (together with its affiliated defendants-appellees, "Verizon") when he terminated Digital Subscriber Line ("DSL") service from Verizon in March 2011. Klein claimed that the ETF is an unlawful liquidated damages penalty in violation of the Virginia Consumer Protection Act, Va. Code § 59.1-200(A)(13). Klein sought statutory damages and other relief.

Verizon moved to dismiss Klein's claims or, in the alternative, to compel arbitration. The district court denied Verizon's motion to dismiss on the basis of a Fed. R. Civ. Pro. 68 offer of judgment, and found that Verizon's offer of judgment did not offer complete relief to the class. A. 221, 232-36. Verizon has cross-appealed. No. 14-1735.

The district court granted Verizon's motion to compel arbitration, on the basis of the 2012 Terms of Service ("2012 TOS"). A. 221. The district court ruled that: 1) Klein assented to be bound by the 2012 TOS (A. 234-36); 2) the 2012 TOS applied to the 2010 Terms of Service ("2010 TOS") (A. 236-38) retroactively; and 3) Maryland law applied to the dispute instead of Virginia law, which was

designated in the 2010 and 2011 Terms of Service ("2011 TOS") as the governing law. A. 234.

The district court entered a short written order on October 19, 2012 compelling arbitration of Klein's claims.  A. 220.  A Memorandum and Order setting forth fully the Court's Opinion was entered on January 31, 2013.  A. 221; *Klein v. Verizon Comm., Inc.,* 920 F. Supp.2d 670 (E.D. Va. 2013).  This action was stayed pending arbitration.

The parties participated in arbitration pursuant to the Court's Order in March 2014.  The arbitrator rendered his Opinion on March 17, 2014.  On April 9, 2014 the parties filed a Stipulation with the district court requesting an Order to reinstate the Action to the docket.  A. 244.  This Order was entered by the district court on June 17, 2014 (A. 251), and reduced to a Judgment on June 18, 2014.  A. 252.

## STATEMENT OF FACTS

**1.    Klein's Subscription to Bundled Services, Termination of DSL Service, and Second Subscription to Bundled Services.**

In November 2010, Klein ordered Verizon's Double Freedom Bundled Service (telephone and DSL internet) for his home in Baltimore, Maryland.  *See* A. 223.  In order to initiate service, Klein was required to agree to the Verizon Online Terms of Service ("2010 TOS").  *Id.* (referencing complaint, ¶33, Ex. A, A. 30).  The 2010 TOS did not provide an opportunity or means for Klein to modify

4

or negotiate any changes in the Terms of Service. A. 116, Klein Decl. ¶5. The
2010 TOS incorporated the terms and the "specific elements" of the Bundled
Service plan described in the order confirmation. *Id.* Klein's confirmation
provided for an early termination fee ("ETF") if he cancelled either the internet or
telephone service prior to the expiration of the one-year term. A. 122; *see* A. 223.

After ordering and receiving the Verizon Bundled Services, Klein
encountered significant billing issues and internet connectivity problems. A. 116-
17; *see* A. 223. Klein notified Verizon customer service on numerous occasions
regarding his billing and service issues, but Verizon failed to fix the problems. A.
117. Verizon customer service told Klein that the only way to address the
problems was to terminate service, so he verbally authorized Verizon to terminate
the DSL portion of his service in early March 2011. *Id.*

On March 10, 2011, Klein received an email from Verizon confirming the
cancellation of internet service and advising that an "early termination fee will
apply." A. 141; *see* A. 223. The March 20, 2011 bill contained a $135 charge for
Early Termination Fee, which Klein paid, as seen on the April 20, 2011 bill. A.
117; *see also* A. 145, 152.

After the service cancellation, Klein had no Internet service (DSL) from
Verizon for a period of time in March 2011, while he contacted Verizon's
competitors and conducted a cost-benefit analysis of the available options. A. 118.

5

Contrary to Verizon's assertion that he received Verizon DSL service "continuously," the break in DSL service is shown on the March 20, 2011 bill, where there is a period of time when no DSL service is billed. *See* A. 145.

After some research and consideration of competitive services, Klein called Verizon later in March 2011 to order a new Verizon Bundled Service consisting of telephone and DSL. A. 118; *see* A. 223. The new plan had a different name, Verizon Double Play. A. 118. As before, to initiate service as a Verizon Bundled Services customer, Klein was required to agree to the Verizon Online Terms of Service. ("2011 TOS"), A. 37; *see* A. 223. Like the 2010 TOS, the 2011 TOS incorporated the terms and the "specific elements" of the Bundled Service plan described in the order confirmation. *See* A. 30, 37 (Complaint, Exs. A & B). Verizon created a new email account associated with the 2011 TOS and Klein was unable to access the Verizon email account associated with the 2010 TOS. A. 119.

## 2. The 2010 and 2011 Terms of Service

### a. Early Termination Fee

The 2010 TOS state that the contract between Verizon and its customers consists of the terms contained in the document itself, "the specific elements of your Service or Bundled Service plan (including the plan's pricing, duration and applicable Early Termination Fee ('ETF')," and other policies attached to the

document that are available online.  A. 30, § 1.  The ETF was one of those
"elements."  A. 116.

### b.  Verizon's Ability to Revise the Terms of Service Prospectively

Each of the 2010 and 2011 TOS contained terms permitting Verizon to
revise the terms of service prospectively.  *See* A. 30, 37-38 (Complaint, Exs. A &
B, § 3). The sections in each of the TOS are nearly identical.  They stated in
relevant part, A. 37-38 (emphasis added):

> **REVISIONS TO THIS AGREEMENT**
>
> From time to time we will make revisions to this Agreement and the
> policies relating to the Service.  We will provide notice of such
> revisions by posting revisions to the Website Announcements page, or
> sending an email to the email address you provide to receive
> communications from us (your "Primary Email Address"), or both.
> You agree . . . to notify Verizon immediately of any changes in your
> Primary Email Address.  We will provide you with at least thirty (30)
> days notice prior to the effective date of any increases to the monthly
> price of your Service or Bundled Service plan . . . *revisions to any
> other terms and conditions shall be effective on the date noted in the
> posting and/or email we send you.*  By continuing to use the Service
> after revisions are effective, you accept and agree to abide by them.

Each section specifically states that revisions will be effective on the "date noted in
the posting and/or email we send you."  *Id.*  Neither the 2010 nor the 2011 TOS
specified retroactive application of revisions to the Terms of Service.  *See Id.*

### c.  Choice of Law:  Selecting Virginia Law and the Survival Clause

7

Both the 2010 and 2011 Terms of Services contain an express choice of law clause ("Choice of Law clause") designating Virginia law as the law governing the parties' relationship under the agreement:

> Except as otherwise required by law, you and Verizon agree that the substantive laws of the *Commonwealth of Virginia*, without reference to its principles of conflicts of laws, will be applied to govern, construe and enforce all of the rights and duties of the parties arising from or in any way relating to the subject matter of this Agreement.

A. 33, 45-46 (Complaint, Exs. A and B, §15.4) (emphasis added); *see* A. 224.

The 2010 and 2011 TOS also contain a provision which states under the heading "General Provision": "All obligations of the parties under this Agreement, which, by their nature, would continue beyond the termination of this Agreement, including without limitation, those relating to Limitation of Liability and Indemnification, shall survive such termination." A. 33, 45 (Complaint, Exs. A and B, §15.1). Clauses using this language are generally referred to as Survival Clauses. This Survival Clause applied to the Choice of Law Clause.

### 3. Verizon's Unilateral Modification of the 2011 Terms of Service

#### a. Email of the Browsewrap Notification of the New Terms of Service

On June 20, 2012, Verizon sent an email to Klein's Verizon email address notifying him of changes to the 2011 TOS ("2012 TOS). A. 224-25. The email stated that the 2011 TOS had been revised to require that disputes be resolved by

arbitration or in small claims court. *Id.* The email also stated that "[b]y continuing

to use the services after the date of this notice, you accept and agree to abide by the

revised terms." *Id.* Further, it stated:

> Please note that if your services were purchased prior to Dec. 31, 2011
> and are subject to term requirements with Early Termination Fees, the
> revised dispute resolution provisions will not be effective until
> expiration of your current service term period, although you may elect
> to accept the revised Terms of Service and take advantage of the
> mediation/arbitration provisions prior to that date by notifying
> Verizon.

A. 84-85. Klein received the email and eventually opened it on July 10, 2012,

according to Verizon. A. 224. Klein contends that this language is significant

because it evidences Verizon's intent that the arbitration clause would not apply to

claims like Klein's claim, which arose out of the imposition of ETFs which were

subject to prior versions of the Terms of Service.

### b. **The 2012 TOS**

The 2012 TOS were accessible to Klein only if he clicked on a hyperlink

contained in the email. A. 64 (Walker Decl. ¶ 5). Klein was not required to click

on the hyperlink to continue to use the Verizon services. A. 235-36 (finding that

continued use was evidence of assent). The district court did not make a finding

that Klein clicked on the hyperlink. *Id.* The district court found only, "At no point

does Klein expressly refute Verizon's contentions regarding Klein's receipt on this

date, nor does he provide any indication that he objected to the modifications at

any time prior to submitting his Opposition to this Motion." *Id.* Klein did not take

any action to assent to the 2012 TOS. *Id.*

The 2012 TOS included, among other things: 1) extensive mandatory

arbitration provisions; and 2) changes to the governing law, from Virginia to the

Federal Arbitration Act and the substantive law of the customer's billing address,

in this case Maryland. A. 102-03 (§ 15.4); *see* A. 225). The 2012 TOS stated that

"revisions to any other terms and conditions [other than pricing] shall be effective

on the date noted in the posting and/or email we send you." A. 89 (§ 3).

The Arbitration Clause is contained in two sections in the 2012 TOS. The

first reference is in §15.4, which stated in relevant part:

> Except as otherwise required by law, you and Verizon agree that the
> Federal Arbitration Act and the substantive laws of the state of the
> customer's billing address, without reference to its principles of
> conflicts of laws, will be applied to govern, construe and enforce all of
> the rights and duties of the parties arising from or relating in any way
> to the subject matter of this agreement. Unless you and Verizon agree
> otherwise, you and Verizon consent to the exclusion personal
> jurisdiction and venue in an arbitration or small claims court . . .
> related . . . to this agreement.

A. 102. This Arbitration Clause twice refers to its imposition on "this agreement."

As explained below, and as argued to the district court, Klein's cause of action was

brought under the 2010 TOS, which was terminated. Klein's claims were not filed

under the 2012 TOS, or "this agreement." The second section containing the

Arbitration Clause is §18.1, which also refers only to "this agreement." A. 104.

## SUMMARY OF ARGUMENT

When Klein subscribed to home telephone and DSL internet bundled service with Verizon in November 2010, there were two central features of his service agreement (2010 TOS) that applied in the event of termination of one of his bundled services: 1) the imposition of an ETF; and 2) the application of Virginia law to govern any disputes. Klein terminated service in March 2011 under the 2010 TOS, and was assessed and paid the ETF. Later, he signed up again as a Verizon bundled service customer, and was required to enter into a new agreement (2011 TOS). Contrary to the argument of Verizon, Klein's Verizon service was not "continuous." There was a total break of service and a new contract applied to the new service.

The district court glossed over these essential facts and the Virginia choice of law provision in making an *ab initio* choice of law decision in favor of Maryland law. The court compounded its error by applying a presumption in favor of arbitration that "bolstered" its decision. Such an assumption does not pertain to whether the parties agreed to arbitrate in the first place. The court's reliance on federal law rather than the correct state law—Virginia—also wrongly influenced the court's error in using the arbitration clause in the 2012 TOS to apply to the dispute under the terminated 2010 TOS.

11

There are two reversible errors in the district court's decision to apply Maryland law and find that Klein's continued use of Verizon's services in 2012 amounted to consent to be bound by the new arbitration provisions in the 2012 TOS. First, Virginia law, the correct state law to apply, requires express mutual agreement of the parties to invoke a contractual modification, and the mutual intention must be shown by clear, unequivocal and convincing evidence. Klein's silence and his mere continued use of the service supplied neither.

Second, in cases involving contractual modification in the internet context, there has arisen a distinction between "clickwrap" and "browsewrap" agreements, the former being those requiring a subscriber to click on the acknowledgment of the new terms presented ("I agree," for example), and the latter being ones not requiring the user to take any action to agree to the modified terms. Klein's case is a browsewrap case. The district court erred in relying on a single clickwrap case, where the user affirmatively assented to the new terms of use. The correct application of the rule of assent in a browsewrap consumer case is illustrated by the decision in *Specht v. Netscape Commc'n Corp.*, 306 F.3d 17 (2d Cir. 2002), where the court ruled that the bare act of downloading software did not signify assent to an arbitration clause.

The court's decision that the 2012 TOS applied retroactively to modify the terminated 2010 TOS is erroneous for three reasons. First, the revisions clause in

12

the Verizon TOS by its own plain language operated prospectively only. The district court incorrectly relied upon decisions from this Court where there was a seamless contractual relationship between the parties and broad language supporting retroactive application, unlike the "stop-and-go business dealings" between the parties, as here, which prohibited application of an arbitration clause under a subsequent contract to a dispute under an earlier agreement.

Second, Verizon's power, in the revisions clause, unilaterally to impose and then terminate an arbitration agreement renders that agreement illusory and unenforceable. Notice that change is being effected is inadequate to save the new arbitration agreement from being illusory, especially in the situation where it purports to apply to claims that arose before the amendment, as here. The error in Klein's case was more extreme, because even the notice component effectively was missing. Due to the nature of the service, where Klein accessed the internet through Verizon DSL, Klein's continued use "acceptance" occurred instantaneously, giving him no real opportunity to consider and reject the change.

Third, the introduction of mandatory arbitration in the 2012 TOS was expressly limited to disputes under the 2012 TOS. Repeated references to arbitration under the 2012 TOS are limited to "this Agreement," with none indicating retroactive application to past agreements.

## ARGUMENT

### I.    Standard of Review

Appellate courts review *de novo* a district court's determination of the arbitrability of a dispute. *United States v. Bankers Ins. Co.*, 245 F.3d 315 (4th Cir. 2001), quoting *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998).

The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court. *Auction & Estate Reps., Inc. v. Ashton,* 354 Md. 333, 341, 731 A.2d 441, 445 (1999).

### II.    In Determining Whether the Parties Agreed to Arbitrate, the District Court Erred in Applying Maryland Rather Than Virginia Law, and Erred in Applying a Presumption in Favor of Arbitration.

#### A. The District Court Ignored the Choice of Law Provision In the Terms of Service and Incorrectly Applied Maryland Rather Than Virginia Law.

Despite the presence of a clear statement in both the 2010 and 2011 TOS that Virginia law governed, the district court applied Maryland law and rejected application of Virginia law in determining whether the 2012 TOS constituted a valid contract modification of the 2010 and 2011 TOS requiring the parties to arbitrate.  However, the 2010 and 2011 TOS contained a choice of law clause selecting Virginia law as the governing law under the contract, A. 33, 45 (2010 and 2011 TOS, §15.4):

Except as otherwise required by law, you and Verizon agree that the substantive laws of the Commonwealth of Virginia, without reference to its principles of conflicts of laws, will be applied to govern, construe and enforce all of the rights and duties of the parties arising from or in any way relating to the subject matter of this Agreement.

The court ignored the choice of law clause in invoking "traditional principles" of contract formation to determine that Maryland law applied to the question of whether the parties agreed to arbitrate. A. 234. This was error. The obligation to follow the choice of law clause where available is illustrated by *Harold H. Higgins Realty, Inc. v. FNC, Inc.,* 575 F. Supp. 2d 696 (D. Md. 2008). In *Higgins,* the Court stated, "[w]ith no question that the terms of the 2002 Agreement govern its modification and specify that such terms be governed by the law of Mississippi, the Court will apply Mississippi law in determining whether the 2005 Agreement superseded all prior agreements to which the Arbitration Plaintiffs were parties." *Id.* at 704. *See also Perry v. Fleetboston Fin. Corp.*, 2004 U.S. Dist. LEXIS 12616, at *6 (E.D. Pa. July 6, 2004) (applying Rhode Island law to determine whether modification created a valid agreement to arbitrate because original contract contained choice of law clause selecting Rhode Island law).

Virginia courts enforce choice of law provisions in the absence of unusual circumstances. In Virginia, the "nature, validity and interpretation of contracts are governed by the law of the place where made, *unless the contrary appears to be the express intention of the parties*." *C.I.T. Corp. v. Guy*, 170 Va. 16, 22 (Va.

15

1938) (emphasis added); *see also Black v. Powers*, 628 S.E.2d 546, 554 (Va. Ct. App. 2006) (holding that the validity of an agreement is governed by the jurisdiction where the agreement was executed, "*unless* the parties clearly intended the [] agreement to be governed by the laws of a specific jurisdiction.") (emphasis added). In sum, it is well settled that "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (giving effect to parties' choice of law clause and applying Virginia law) (citing *Tate v. Hain*, 181 Va. 402, 25 S.E.2d 321, 324 (Va. 1943)).

Here, the use of the word "govern" in the 2010 and 2011 TOS reflects Verizon's clear intention that Virginia law controls all questions concerning interpretation of the agreement. The language is also clear that Virginia law applies "without reference to" Virginia's conflict of laws principles. A. 33, 45. If the district court had treated the Agreements according to the general rules of contract construction – reading the document as a whole, *e.g., Berry v. Klinger,* 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983) – it would have applied the choice of law clause to "all of the rights and duties of the parties arising from or in any way relating to the subject matter of this Agreement." Specifically, the court erroneously relied upon the revisions provision in §3 of the 2010 Terms of Service instead of applying the choice of law provision in §15.4 and the survival clause in

16

§15.1.  As shown below, the application of Virginia law would have led to a different result in this case.

### B. The District Court Incorrectly Applied a Presumption in Favor of Arbitration in Deciding That the Parties Had Agreed to Arbitrate.

On the crucial question of whether the parties agreed to arbitrate their differences, the district court repeatedly invoked a presumption in favor of arbitration.  This presumption has no place in the decision on the formation of an arbitration agreement, as opposed to its scope.  The court's presumption analysis favored Verizon unfairly, and infected the decision overall.  This Court should remove the imprint of the thumb of presumption in reviewing the matters presented for review here.

The district court ruled that any ambiguities in the contract would be construed in favor of arbitration and that it would observe a presumption in favor of arbitration, stating, "Ambiguities as to the scope of the arbitration clause are resolved in favor of arbitration."  A. 236.  It went on to say, "Federal law controls the interpretation of arbitration agreements, even where a contract includes a choice of law provision."  A. 228.  It also stated, "Such a reading is bolstered by the presumption in favor of arbitration, particularly where such clauses are broadly worded."  A. 237.

The district court incorrectly applied the presumption in favor of arbitration in deciding whether the parties agreed to arbitrate in the first instance.  On this

17

fundamental question, the district court should not have 1) applied federal law or 2) considered the *scope* of the arbitration agreement.  *See Sys. Research & Applications Corp. v. Rhode & Schwarz Federal Sys., Inc.,* 840 F. Supp.2d 935, 941-42 (E.D. Va. 2012).  The determination of whether an arbitration clause is part of the agreement between the parties must be made based on state law and there is no presumption in favor of finding that an agreement existed.  *Id.*

It is axiomatic that "a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit."  *Brown v. Trans World Airlines*, 127 F.3d 337, 340 (4th Cir. 1997); *see also Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 374 (1974).  As the U.S. Supreme Court has directed, "we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement."  *Equal Emp't Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  "Even though arbitration has a favored place under federal law, there still must be an underlying agreement between the parties to arbitrate."  *Arrants v. Buck,* 130 F.3d 636, 640 (4th Cir.1997) (finding no enforceable arbitration agreement between the parties).  Although "it also is well-settled that federal law favors arbitration . . .  the presumption applies only as to doubts respecting the scope of the agreement reached by the parties. It does not apply in resolving doubts respecting whether the parties have reached an agreement . . ."  *Hendrick v. Brown & Root, Inc.*, 50 F.

18

Supp. 2d 527, 533 (E.D. Va. 1999) (*citing Carson v. Giant Food, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999) (agreement to arbitrate is "fundamentally about private choice," and whether dispute is arbitrable "is focused on the intent of the parties.").

The only presumptive tilt in the decision on the formation of an agreement to arbitrate should have been in favor of Klein, not Verizon. The district court should have looked to state law, which governs the question of whether a binding agreement was formed. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) (stating that state law is used to determine which contracts are binding under § 2); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 939 (1995) (stating "Courts generally should apply ordinary state-law principles governing contract formation in deciding whether such an agreement exists"). As shown above, the operative state law here is the law of Virginia. Virginia law requires that any ambiguity in the contract language must be construed against the drafter – Verizon - under the doctrine of contra proferentum. *Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 182, 519 S.E.2d 133, 140 (1999); *see also Karnette v. Wolpoff & Abramson*, L.L.P., 444 F. Supp. 2d 640, 647 (E.D. Va. 2006) ("the rule of contra proferentem applies to arbitration clauses just as to other contractual terms") (applying Delaware law). The principle is particularly applicable to contracts of adhesion, like the one here, where the drafting party is typically far more

19

knowledgeable and sophisticated than the non-drafting party.  Rest. (Second) of

Contracts §206 cmt. a (1981).

In conflating the issue regarding the scope of the agreement with the issue of

whether Klein was bound to the arbitration provisions of the 2012 TOS, the district

court relied on *Levin v. Alms Assocs., Inc.,* 634 F.3d 260 (4th Cir. 2011).  In *Levin,*

the parties entered into agreements in 2004, 2005, 2006, and 2007, which governed

the parties' relationship.  There was *no dispute* that the plaintiff in *Levin* had

agreed to the 2007 Agreement, which contained the arbitration clause.  The 2007

agreement included the following integration and arbitration clauses:

> It is agreed by and between the parties hereto that this agreement
> encompasses and embodies all terms, understandings and agreements
> by and between those parties and the terms may not be amended
> except in writing by the parties hereto.
>
> *****
>
> *Any dispute shall be submitted to binding arbitration* before a single
> arbitrator in Howard County, Maryland, under the rules of the
> American Arbitration Association, and the decision of the arbitrator
> shall be final and binding upon the parties....

*Id.* at 266-67.  Therefore, the *Levin* court was construing the *scope* of the

agreement and not ruling on whether the 2007 agreement was enforceable.

Here, unlike in *Levin,* the issue is whether the 2012 TOS is enforceable.  The

ruling in *Levin* is therefore inapposite on the threshold question of the

agreement to arbitrate.  Compounding the error in the district court's

20

analysis was its heavy reliance on the presumption in favor of arbitration which "bolstered" its decision. A. 237. And, as shown below, the misplaced presumption also bolstered the core error in the court's decision to view the 2012 TOS to apply to the 2010 TOS that had been terminated by the parties. This Court's review should proceed without reliance on the misplaced presumption in favor of arbitration.

**III.    The District Court Erred By Finding That Klein's Silence and Continued Use of the Verizon Service Were Sufficient to Assent to the 2012 TOS**

In derogation of the choice of law provisions in the 2010 and 2011 TOS, the district court applied Maryland law and found that Klein's continued use of Verizon's services equaled consent to be bound by the 2012 TOS. Under Virginia law, there was no basis under general contract principles to find that Klein assented to the 2012 TOS. Also, in the present context of an internet agreement, neither Virginia nor Maryland law supports a finding of assent.

A.    <u>General Contract Principles Preclude a</u>
<u>Finding of Assent to the 2012 TOS.</u>

Under Virginia law, a "modification cannot occur . . . without the express mutual agreement of the parties." *Powell Mountain Joint Venture v. Moore*, 248 Va. 63, 66 (1994) (citing *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 72 (1983)) (emphasis added). Here, there is no dispute that Klein never expressly agreed to the 2012 modification. A. 235-36. In addition, implying a contract

21

modification through the parties' conduct requires convincing evidence that Verizon did not offer. In Virginia, "the circumstances surrounding the conduct of the parties must be sufficient to support a finding of a 'mutual intention' that the modification be effective." *Stanley's Cafeteria*, 226 Va. at 73 (quoting *Warren v. Goodrich*, 133 Va. 366, 388 (1922)). The mutual intention must be shown by "clear, unequivocal and convincing evidence, direct or implied." *Id.*

The district court did not cite "clear, unequivocal and convincing evidence, direct or implied" that Klein assented to the terms of the 2012 TOS. A. 235 ("At no point does Klein refute . . . "). Thus, the district court should not have found that Klein assented to the 2012 TOS through continued use of the services. *Cf. Myers*, 2001 U.S. Dist. LEXIS at *9 (rejecting argument that failure to reject a term constituted acceptance even where contract stated that new terms would be effective unless rejected); *Bailey v. Fed. Nat'l Mortgage Ass'n*, 209 F.3d 740 (D.C. Cir. 2000) (holding that employee's failure to reject the proposed arbitration clause did not evidence his assent to be bound); *Union Planters Bank v. Rogers*, 923 So. 2d 116 (Miss. 2005) ("Waiving [the right to file a lawsuit] requires more than implied consent.").

Certainly Klein's silence did not provide evidence of assent. "An offeror cannot, merely by saying that the offeree's silence will be taken as an acceptance, cause it to be such." *Myers v. MBNA Am. & N. Am. Capitol Corp.*, 2001 U.S. Dist.

22

LEXIS 11900, at *9 (D. Mont. Mar. 28, 2001) (quoting Joseph M. Perillo,

CORBIN ON CONTRACTS § 3.18 (1993 & Supp. Fall 2000), at 407-08.).   The

district court's interpretation that the 2012 TOS applies to the dispute arising out of

the 2010 TOS divested Klein of "a vested right to a judicial resolution of an

accrued claim on the basis of silence in a contract drafted by [Verizon]."

*Hendrick,* 50 F. Supp. 2d at 535.  Under Virginia law, waiver requires both: (1)

knowledge of the facts necessary to the exercise of the right and (2) intent to

relinquish that right.  *Emp'rs Comm. Union Ins. Co. of Am. v. Great Am. Ins. Co.*,

214 Va. 410, 412-13, 200 S.E.2d 560, 562 (1973).  Thus, Verizon's effort to

compel arbitration based on the contract's silence as to preexisting disputes would

be "flatly at odds with the precept that a waiver cannot occur unless there is a

knowing and deliberate relinquishment of a right."  *Hendrick*, 50 F. Supp. 2d at

535 (citing *Parkerson v. Fed. Home Life Ins. Co.*, 797 F. Supp. 1308, 1320 (E.D.

Va. 1992)).   Those circumstances are not present here.

B.  The Law that Has Developed in the Internet Context
    Precludes a Finding of Assent.

Irrespective of whether Maryland or Virginia law applies to the question of

whether Klein agreed to the 2012 TOS containing an arbitration agreement, the law

developed in the context of internet agreements confirms that there was no assent

to the modification in the 2012 TOS.   Verizon stated that, on June 20, 2012, Klein

was sent an email from Verizon stating that new TOS required resolution of

disputes through arbitration or in small claims court.  A. 64 (Walker Decl. ¶ 5).
The 2012 TOS were not attached to the email. To see the 2012 TOS, Klein was
required to open the email and click on a hyperlink contained in the email.  *Id.*
However, Klein did not even open the email until July 10, 2012.  *Id.* ¶ 6.  Thus,
under the district court's ruling, Klein was deemed to have assented to the
modification by using the service for three weeks before he even saw the email
advising him that use of service constituted acceptance.

Klein was not required to click on the hyperlink to continue to use the
Verizon services.  The district court did not make a finding that Klein clicked on
the hyperlink.  The district court found only "At no point does Klein expressly
refute Verizon's contentions regarding Klein's receipt on this date, nor does he
provide any indication that he objected to the modifications at any time prior to
submitting his Opposition to this Motion."  A. 235-36.  (To the contrary, Klein
filed suit the day after he opened the email.)  Klein did not take any action to
assent to the 2012 TOS, and he was not required by Verizon's email to assent to
the 2012 TOS in any way to continue to use the service.  *Id.*  The law is clear that
under these circumstances, in the internet context, Klein did not assent.  *See Specht
v. Netscape Commc'n Corp.*, 306 F.3d 17 (2d Cir. 2002).

The district court found that these circumstances were sufficient 1) for Klein to assent to the 2012 TOS requiring arbitration and 2) to a change of the forum selection clause, stating:

> Klein's continued use of services after notice of the contract modification assented to the contractual modifications because the terms of the agreement between the parties explicitly provided that continued use of services after notice of a contract modification is sufficient to assent to any modifications.

Op. at 15.

The district court erred because it did not analyze the consequence of the fact that the 2012 TOS did not require Klein's acknowledgement or assent in the online context, and to the contrary, based its conclusion on a decision, *CoStar Realty Info. v. Field,* 612 F. Supp. 2d 660 (D. Md. 2009), involving an online agreement *which required acknowledgement and assent*. A. 234-35. Online agreements which require acknowledgement and assent are referred to in the caselaw as "clickwrap" agreements. The 2012 TOS was not a "clickwrap" agreement. The district court's reliance on *CoStar* was error.

The 2012 TOS were available to Klein as a "browsewrap agreement." The term "browsewrap agreement" is a term used by courts to refer to online contractual "Terms of Use" which only appear to the user via a hyperlink or other mechanism, and most significantly, do not require the user to take any action to signify agreement to the purported terms. A "defining feature" of

25

a browsewrap agreement "is that it does not require a user to manifest assent to the terms and conditions expressly—the user need not sign a document or click on an 'accept' or 'I agree' button." *AvePoint Inc. v. Power Tools, Inc.,* Civil Action No. 7:13CV00035, 2013 WL 5963034, *8 (W.D.Va. Nov. 7, 2013) (*citing Southwest Airlines Co. v. BoardFirst, LLC,* No. 3:06–CV–0891, 2007 WL 4823761, at *4, 2007 U.S. Dist. LEXIS 96230, at *14 (N.D.Tex. Sept. 12, 2007) (finding actual or constructive knowledge of terms, in commercial context).

In *CoStar,* the clickwrap agreement case, the only decision involving an online user agreement considered by the district court, the Court listed all the ways in which the online user affirmatively assented to the terms of use: "A user of CoStar's database must accept the Terms of Use the first time the user accesses the database and at periodic intervals thereafter. . . both Lawson and Gressett had to periodically assent to the Terms of Use in the almost four years they accessed CoStar's database." *Id.* at 668-69. Those circumstances are not present here.

Defendant did not cite and the district court did not consider a single decision in which a court enforced a browsewrap agreement against a consumer. Relevant caselaw favoring the consumer and rejecting a browsewrap agreement exists. In *Specht v. Netscape Commc'n Corp.*, 306 F.3d 17 (2d Cir. 2002), the seminal Second Circuit decision involving browsewrap agreements, the Second Circuit considered factual circumstances analogous to the factual circumstances

26

here -- the dispute occurred between a consumer and a commercial enterprise, and defendant claimed online terms including an arbitration clause could be enforced without assent or acknowledgement by the consumer.

In *Specht,* then Circuit Judge Sotomayor affirmed the district court's decision *not* to enforce the arbitration clause. There, users downloaded free software which came with terms of use that included an arbitration clause, but the terms were located on a screen below the download button, and the plaintiffs were not required to "click" an assent to the terms and conditions to download the software. Thus, the court concluded that "Plaintiffs' bare act of downloading the software did not unambiguously manifest assent to the arbitration provision contained in the license terms." Contrary to the Second Circuit's holding, the district court here concluded that the "bare act" of receiving the email from Verizon and continued use of service signified Klein's assent

In addition, the three district court decisions in the Fourth Circuit to have addressed the validity of browsewrap agreements - involving claims against competitors, rather than claims by consumers - support the viewpoint that action beyond the mere receipt of a hyperlink is necessary to bind the recipient to contractual terms. *See Cvent, Inc. v. Eventbrite, Inc.,* 739 F.Supp.2d 927 (E.D.Va.2010) (dismissing complaint, finding no indicia of constructive or actual knowledge); *AvePoint,* Civil Action No. 7:13CV00035, 2013 WL 5963034

27

(W.D.Va. Nov. 7, 2013) (sustaining plaintiff's claim, denying 12(b)(6) motion due

to allegations of affirmative assent to terms); and *Kraft Real Estate Investments*

*LLC v. Homeaway.com*, Civil Action No. 4:08–CV–3788, 2012 WL 220271,

*10 (D.S.C. Jan. 24, 2012) (ruling plaintiff not subject to terms and conditions

placed on website which did not require "click" for assent).  In every case, the

court required the party seeking to enforce the terms and conditions to demonstrate

actual or constructive knowledge on the part of the other party.  *Cvent,* at 937;

*AvePoint*, 2013 WL 5963034, *9; *Kraft Real Estate Investments LL,* 2012 WL

220271, *10 (Although terms and conditions posted, no evidence demonstrates

aware of or assented to terms, in contrast to when website implemented "click"

assent).

    In *Cvent, the court* dismissed a breach of contract claim between two

businesses where the alleged contract was predicated on terms of use found only

through a hyperlink at the bottom of the first page of the plaintiff's website, and no

allegations in the complaint reflected actual or constructive knowledge of the terms

by defendant, let alone any manifestation of assent to them.[1]  The court stated:

---

[1] The Court analyzed a claim under the Uniform Computer Information
Transactions Act (UCITA), as adopted by Virginia law, which provides a breach of
contract claim for violation of electronic Terms of Use, if a person (1) has an
"opportunity to review" the terms and (2) engages in statements or conduct
indicating, or leading one to infer, the person's "assent" to the terms. Va.Code §
59.1–501.11 & 59.1–501.12.

In its complaint, Plaintiff makes bare assertions that its Terms of Use were prominently displayed on its website, that defendants had an "opportunity to review" the Terms of Use pursuant to Va.Code Ann. § 59.1–501.13:1 and Va.Code Ann. § 59.1–501.14:1, and that defendants manifested assent to those terms merely by accessing Cvent's venue location database. However, those conclusory allegations are flatly contradicted by the screenshots of Cvent's website and are plainly insufficient under the *Iqbal* and *Twombly* standard to state a plausible claim for relief, The essence of a breach of contract claim is a meeting of the minds and a manifestation of mutual assent. *See Restatement (Second) of Contracts* § 17 cmt. c (1981).

*Cvent,* at 937-38.

In *AvePoint*, where the breach of contract claim was analyzed under Virginia law, 2013 WL 5963034 at *8, the plaintiff also sought to enforce terms and conditions set forth in a hyperlink against a competitor. The court sustained the complaint on a Rule 12(b)(6) motion to dismiss, finding plaintiff had properly pled that defendant had actual or constructive notice of terms and conditions of the browsewrap agreement because the plaintiff was able to offer allegations that the defendant engaged in affirmative acts demonstrating actual or constructive knowledge. "Specifically, AvePoint contends that the fact that Axceler went to the trouble of creating a fictitious profile and email account in order to download the software suggests that Axceler had knowledge of the Terms and Conditions, and was aware that they prohibit users from downloading materials for commercial use. AvePoint also claims that Axceler has a similar browsewrap agreement on its own website . . ." *Id.* at 9. No such evidence has been presented regarding Klein's

29

knowledge.

In *Kraft,* another dispute between competitors, the court set forth extensive rationale for its finding that defendant failed to demonstrate plaintiff had constructive or actual notice of the terms.

> In this case, the record reflects only that when initially posted, the terms and conditions were available via a hyperlink posted on the home page of the websites. However, the record does not contain any information as to the size of the font of the hyperlink or the language used to alert the website users to the terms and conditions. As Knopff averred that she has never read the terms and conditions, this would suggest that she did not have actual knowledge of these terms and conditions at this time. Therefore, the Court cannot conclude that the terms and conditions were binding on Knopff by virtue of the browsewrap agreement in place at the time the listings were initially posted on A1 Vacations.
>
> While Defendants argue that Knopff admitted being subject to the terms and conditions posted by using the website, Defendants fail to attach the cited deposition testimony to their motion. Moreover, Knopff did not testify as the representative of the company, and so her purported admission cannot be deemed a party admission. Finally, this is a legal conclusion and, as discussed above, the record does not reflect that plaintiffs had notice of the terms and conditions as would be legally required to establish a valid and enforceable browsewrap agreement.

*Id.* at fn. 21.  The facts here are distinguishable from the facts in *AvePoint* and similar to the facts in *Kraft.*  Here, the district court relied on Verizon's language, purporting to bind Klein on receipt and the fact that Klein did not object to Verizon's 2012 TOS.  This district court's analysis was error.

30

Indeed, in a widely cited article, Mark A. Lemley, *Terms of Use,* 91 Minn.

L.Rev. 459, 472 (2006), the commentator observed, "An examination of the cases

that have considered browsewraps in the last five years demonstrates that the

courts have been willing to enforce terms of use against corporations, but have not

been willing to do so against individuals." He observed further that:

> Courts may be willing to overlook the utter absence of assent only
> when there are reasons to believe that the defendant is aware of the
> plaintiff's terms. That awareness may be more likely with
> corporations than individuals, perhaps because corporations are repeat
> players, because they themselves employ terms of use and therefore
> should expect that others will, or because some evidence in each
> individual case suggests they are in fact more aware of those terms.
> Whether by accident or by design, the result has so far been the same:
> browsewraps end up having significance not in mass-market contract
> cases, but in what are really b2b property cases.

*Id.* at 477.

For these reasons, this Court should conclude that the district court

departed from established precedent and erred in finding Klein assented to

the 2012 TOS, incorporating an arbitration clause, and should reverse the

district court's decision compelling arbitration.

### IV. The District Court Erred When It Applied the 2012 TOS Retroactively and Considered the 2012 TOS as a Valid Modification to the Terminated 2010 TOS.

The district court ruled that the broad language of Verizon's contract

modification contained in the 2012 TOS which purported to cover "any dispute

that in any way relates to or arises out of this agreement or from any equipment,

product [,] and services [a customer] receive[s] from [Verizon]" was sufficient to be applied retroactively to the 2010 Terms of Service. A. 236-37. The district court erred in making this ruling because: 1) the 2010 TOS contained language which limited modifications to prospective application; 2) the language of the 2012 TOS clearly states that it applies to disputes arising out of *this* agreement – the 2012 TOS; 3) the interrupted contractual relationship between the parties which occurred between the 2010 TOS and 2011 TOS prevents modification to the otherwise defunct 2010 TOS; and 4) the unlimited scope of the clause would render the agreement illusory and therefore unenforceable.

A. <u>The District Erred By Failing to Apply the Plain Language of the 2010 Terms of Service Which Limited Any Modifications to Prospective Application Only.</u>

The district court ruled that the "broad language" of the 2012 TOS signified Verizon's intention that the 2012 TOS apply retroactively to the 2010 Terms of Service. A. 236. However, the district court ignored the plain language of the 2010 TOS, which explicitly states that revisions to it will only be enforceable prospectively: "revisions to any other terms and conditions shall be effective on the date noted in the posting and/or email we send you." A. 30 (2010 TOS, § 3). The revision at issue was sent on June 20, 2012. Therefore, according to the plain language of the 2010 Terms of Service, the arbitration clause could not be effective before June 20, 2012 and the district court's ruling was in error.

32

The district court relied on *Levin, supra,* and *Cara's Notions, supra* (construing Missouri and North Carolina law) in ruling that the arbitration clause in the 2012 TOS should apply retroactively to the 2010 Terms of Service. A. 236-38 ("As noted in *Levin*, a broad arbitration clause … will not be judicially construed to impose limitation on retroactivity"). The factual circumstances underlying those rulings are inapposite to the facts here.

In *Levin,* the parties entered into agreements in 2004, 2005, 2006, and 2007, which governed the parties' relationship. The 2007 agreement included integration and arbitration clauses, 634 F.3d at 266-67. The contractual relationship between the parties was seamless, unlike the contractual relationship here, which was terminated and then restarted. *See Levin* at 261-67, 269. The *Levin* Court found that "the integration and arbitration clauses can easily be read together to state that the "agreement encompasses and embodies all terms, understandings and agreements by and between those parties" and that "[a]ny dispute shall be submitted to binding arbitration." *Id.* The 2004, 2005 and 2006 contracts superseded by the 2007 contract did not include language which stated that revisions reflected in the 2007 agreement would be effective prospectively only, on the date of receipt of the 2007 agreement. Therefore, *Levin* is inapposite and cannot support a finding that the arbitration clause applied to disputes arising under the 2010 Terms of Service here.

33

*Cara's Notions v. Hallmark Cards,* 140 F.3d 566 (4th Cir. 1998), is also inapposite. In *Cara's Notions,* the Court analyzed the relationship between two contracts, and found that the arbitration clause in the second applied to a dispute arising out of the first. However, the first contract permitted modification and did not place any temporal limitations on modifications. Therefore, the ruling in *Cara's Notions* is not relevant to circumstances, such as here, where the contract limits contract modifications to prospective application. Therefore, this Court should find that the district court's ruling was made on an improper basis and in disregard of the plain language of the 2010 Terms of Service.

The district court failed to consider either the ruling in *Hendrick*, 50 F. Supp. 2d 527, 532 (E.D. Va. 1999), or the ruling in *Verizon Advanced Data, Inc. v. Frognet, Inc.*, No. 2:05-cv-955, 2006 U.S. Dist. LEXIS 57223 (S.D. Ohio Aug. 14, 2006), both of which were cited by Klein below and both of which are persuasive because the rulings are based on factual circumstances akin to the factual circumstances here. In *Hendrick*, the contractual relationship between plaintiff and the defendant *was not seamless.* Each time plaintiff was hired by defendant, he submitted a new job application and completed new forms, and each period of employment was formally terminated. This contractual relationship was characterized by the *Levin* court as "stop-and-go business dealings." *Levin*, 634 F.3d at 269.

34

Similarly, here, Klein formally terminated his first contract and stopped receiving DSL service altogether. Verizon also created a new email account for Klein for his 2011 Terms of Service and terminated the email account associated with the 2010 Terms of Service. Thus, whereas the parties in *Levin* engaged in essentially one business transaction governed by a series of renewed contracts, the parties in this case engaged in two distinct transactions, each governed by a separate contract.

Similarly, in *Verizon Advanced Data, Inc. v. Frognet, Inc.*, No. 2:05-cv-955, 2006 U.S. Dist. LEXIS 57223 (S.D. Ohio Aug. 14, 2006), Verizon and the defendant entered into two separate contracts, with the second contract containing an arbitration clause which stated: "The parties desire to resolve disputes arising out of *this Agreement* without litigation. Accordingly, . . . the parties agree to follow the ADR procedure set forth herein as their sole remedy with respect to any controversy or claim arising out of or relating to *this Agreement* or its breach." *Id.* at *3 (emphasis added). The Court found that the arbitration agreement only related to the second contract and Verizon could not be compelled to arbitrate claims under the first contract because "[t]hat arbitration provision contains no language from which the Court could find that the parties agreed to arbitrate anything other than claims that arose from or were related to Contract 2."

Thus, the facts before this Court are clearly analogous to the fact before the courts in *Hendrick* and *Frognet*, and the district court erred by failing to consider the rulings in those cases and by relying on the rulings in *Levin* and *Cara's Notions*.

B. <u>The Court's Reading of the Arbitration Clause to Permit Retroactive Application Renders the Agreement Illusory and Unenforceable.</u>

The Court's interpretation of the 2012 TOS, which added the arbitration clause, allowed Verizon to unilaterally terminate, revise or amend the arbitration requirement for claims that accrued before the revision. Section 3 of the 2011 Terms of Service provides that revisions other than increases to the monthly price of service "shall be effective on the date noted in the posting and/or email we send you. By continuing to use the Service after revisions are effective, you accept and agree to abide by them." A. 38, § 3. The district court's retroactive application of the arbitration clause in the 2012 TOS renders the agreement illusory and unenforceable.

Numerous courts have held, that if a party retains the unilateral, unfettered right to terminate or amend an arbitration agreement, the arbitration agreement is illusory and unenforceable. *See Morrison v. Amway Corp.*, 517 F.3d 248, 255 (5th Cir. 2008); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the

36

unfettered right to alter the arbitration agreement's existence or its scope is illusory."); *see also Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315-16 (6th Cir. 2000) (arbitration agreement was illusory because employer "reserved the right to alter applicable rules and procedures without any obligation to notify, much less receive consent from," other parties); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (among other reasons, employer's ability to modify rules "in whole or in part" without notice to employee renders arbitration agreement illusory). This invalidation of such arbitration clauses is particularly true if amendments to the arbitration can be made to apply to claims that arose prior to the amendment. *Peleg v. Neiman Marcus Group, Inc.*, 204 Cal. App. 4th 1425, 1456 (Cal. App. 2d Dist. 2012) ("the critical issue' is whether the arbitration agreement 'avoid[s] application of … amendments to disputes arising before notice.'") (quoting *Carey*, 669 F.3d at 209 n.4). Providing notice of the change in terms will not save a clause that allows unilateral amendment once claims have accrued. *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 208 (5th Cir. 2012). Thus, the unilateral ability to amend an arbitration agreement renders the agreement illusory, even if amendment requires notice, unless the agreement applies only prospectively to claims that arise after the amendment is made. *See Morrison*, 517 F.3d at 256-57 (holding that, even though notice was required, an arbitration agreement purporting to cover claims that arose prior to the agreement

37

was illusory because defendant had a unilateral right to amend the provision).  As

the Fifth Circuit opined in *Carey,* 669 F.3d at 209:

> [T]he fundamental concern driving this line of case law is the
> unfairness of a situation where two parties enter into an agreement
> that ostensibly binds them both, but where one party can escape its
> obligations under the agreement by modifying it. Requiring notice
> alone does not fully address this concern: if an employer provided for
> 10-day notice of any change to its arbitration provision, this could still
> arguably allow it to avoid its promise to arbitrate as to claims that
> were already in progress, unless there were some provision preventing
> changes from applying to in-progress disputes.

*See also Cheek v. United Healthcare of the Mid-Atl., Inc.*, 378 Md. 139 (Md. 2003)

(holding that agreement to arbitrate was illusory because it allowed defendant to

revoke its obligation to arbitrate at any time, "even after arbitration is invoked, and

even after a decision is rendered").

    In *Morrison v. Amway Corp.*, *supra,* several distributors of Amway products

sued Amway based on a number of causes of action.  Each distributor entered into

a distributorship agreement with Amway—renewed annually—in which they

agreed to, among other things, abide by certain Rules of Conduct set by Amway.

The agreement permitted Amway to amend the Rules of Conduct and stated

amendments would be published in Amway literature.  In 1997, Amway informed

its distributors that it planned to amend the Rules of Conduct to require arbitration

of any claims arising from their Amway distributorship.  The new arbitration

agreement was included in the 1998 Rules of Conduct, which the distributors

signed and acknowledged.  When the distributors sued Amway in 1998, Amway

moved to compel arbitration of all claims asserted.

The distributors argued before the Fifth Circuit that the arbitration

agreement was illusory because "Amway, by virtue of its power to thus amend the

Rules of Conduct, could unilaterally repeal or amend the arbitration provisions so

that they were inapplicable even as to disputes . . . that arose out of events

occurring prior to such an amendment."  After an extensive analysis of the case

law, the Fifth Circuit held that an arbitration agreement that can be unilaterally

amended is illusory and unenforceable if it permits an amendment to apply to

claims that arose before the amendment.  The court stated:

> Here, the Distributors' suit, filed January 8, 1998, was not to any
> extent based on the 1998 distributorship agreement, which for the first
> time contained an arbitration clause, but rather asserted claims arising
> (and based on facts occurring) prior to September, when Amway
> unilaterally amended its rules of conduct to provide for arbitration.
> None of the distributorship agreements prior to that for 1998
> contained anything about arbitration. But all the distributorship
> agreements, both those for 1997 and prior years and those for 1998
> and subsequent years, contained the distributor's agreement to comply
> with Amway's Rules of Conduct as amended by Amway from time to
> time. That right of unilateral amendment extends to providing for
> (and, by necessary implication, to modifying or repealing) arbitration.
> . . .
>
> There is nothing in any of the relevant documents which precludes
> amendment to the arbitration program - made under Amway's
> unilateral authority to amend its Rules of Conduct - from eliminating
> the entire arbitration program or its applicability to certain claims or
> disputes so that once notice of such an amendment was published
> mandatory arbitration would no longer be available even as to

disputes which had arisen and of which Amway had notice prior to the publication. . . .

We accordingly hold that the arbitration agreement was illusory and unenforceable under Davidson as applied to the claims asserted in the instant suit.

*Id.* at 256-57.

The facts here are identical to the facts in *Morrison* in every material way. Here, Section 3 of the 2012 Terms of Service, which sets forth Verizon's ability to revise the agreement, gives Verizon the unilateral right to "make revisions to this Agreement and the policies relating to the Service, including to the provisions that govern the way that you and Verizon resolve disputes." A. 89. Thus, Section 3's language gives Verizon the unilateral power to eliminate the arbitration agreement at-will.

Just as in *Morrison*, there is provision in the agreement that precludes Verizon "from eliminating the entire arbitration program or its applicability to certain claims or disputes . . . even as to disputes which had arisen . . . prior to the publication." *Morrison*, 517 F.3d at 257. The agreement gives Verizon, but not the customer, the power to "revise" the arbitration agreement to cover some disputes but not others, or to avoid its obligation to arbitrate altogether. *Cf. Carey*, 699 F.3d at 206 ("In effect, the agreement allows 24 Hour Fitness to hold its employees to the promise to arbitrate while reserving its own escape hatch."). The 2012 TOS does not contain language restricting a unilaterally-imposed amendment

40

to prospective application.  Indeed, Verizon took the position at the district court level that the same language in Section 3 of the 2011 TOS gave it the power to add an arbitration clause that covered disputes that arose prior to the modifications included in the 2012 TOS.  Even assuming, *arguendo*, that notice and acceptance were present (which they were not), those steps are not "sufficient to make a contract non-illusory."  *Carey*, 669 F.3d at 207.

Although the court below assumed that Klein had the choice of rejecting arbitration by discontinuing service in June 2012, in reality that choice was an illusion.  Here, the very act of Klein's using Verizon's DSL service to access the internet, according to Section 3, constituted acceptance by continued use of the service.  In other words, the revision was binding instantaneously upon notice. Klein had both his telephone and his internet service through Verizon.  He would not be able to find replacements for both of these essential services, have Verizon terminate those services, and have a new company install its services instantaneously.  By treating continuation of service as acceptance, Verizon guarantees that it will be able to argue that all, or essentially all, customers have "accepted" whatever unilateral changes Verizon makes.  As a result, Section 3 provides Verizon with unilateral modification power and does not even give the customer a right to meaningful notice.  *See Carey*, 669 F.3d at 209 n.4 (noting that

although the agreement did not use the words "automatically binding," it did not

provide for a meaningful notice window).

Finally, the district court erred because it failed to consider whether the

arbitration clause fell within the scope of revisions to the 2011 TOS permitted by

its Section 3. Section 3 states that "[f]rom time to time we will make revisions to

this Agreement and the policies relating to the Service." (emphasis added).

Several courts have found that, under nearly identical circumstances, a newly

added arbitration clause is invalid if the addition is outside what the parties

reasonably intended and the contract only permits "changes" to the existing terms.[2]

The arbitration clause in this case constitutes a significant addition to the contract,

not merely a "revision," as there was no arbitration clause in the original contract.

Based on the contents of the original agreement, Klein could not have reasonably

---

[2] *See, e.g., Stone v. Golden Wexler & Sarnese, Prof'l Corp.*, 341 F. Supp. 2d 189, 198 (E.D.N.Y. 2004) (applying Virginia law, holding that to interpret bank's change-of-terms provision as permitting addition of arbitration clause "would permit the Bank to add terms to the Customer Agreement without limitation as to the substance or nature of such new terms); *Sears Roebuck & Co. v. Avery*, 593 S.E.2d 424 (N.C. Ct. App. 2004) (holding defendant could not introduce arbitration provision using change of terms clause because arbitration was not "change" in existing terms and not within reasonable expectation of customers); *Discover Bank v. Shea*, 362 N.J. Super. 200, 827 A.2d 358, 362 (N.J. Super. Ct. 2001) (same); *Long v. Fid. Water Sys., Inc.*, 2000 U.S. Dist. LEXIS 7827, at *9 (N.D. Cal. May 24, 2000) (holding that change of terms provision "is reasonably construed as allowing [the defendant] to terminate its agreement, change the credit limit or change financial terms of the account. It cannot be reasonably construed as explicitly allowing the insertion of an arbitration clause"); *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 79 Cal. Rptr. 2d 273 (1998).

expected to give up his right to judicial resolution of claims by continued use of the service. *Cf. Myers*, 2001 U.S. Dist. LEXIS at *15 (holding that arbitration clause exceeded scope of agreement that included headings entitled How to Use Your Account, Repayment, Billing Cycle, Termination, Costs, and Exclusions). As one court has held, if a company's modification power is not reasonably limited to terms contemplated in the original agreement, consumers "would find themselves in an Orwellian nightmare, trapped in agreements that can be amended unilaterally in ways they never envisioned." *Perry v. Fleetboston Fin. Corp.*, 2004 U.S. Dist. LEXIS 12616, at *15 (E.D. Pa. July 6, 2004).

Thus, because the district court read Section 3 to allow unilateral amendments that apply retroactively, it renders the arbitration agreement contained in the 2012 TOS illusory and unenforceable. *Cf. Weekley Homes, LP v. Rao*, 336 S.W.3d 413, 421 (Tex. App. 2011) (finding that failure of handbook to limit modifications to prospective application gives defendant unilateral power).

      C.  The 2010 TOS Had Been Terminated and Could Not Then Be Modified, As the 2012 TOS Uses Limiting, Present Tense Language.

      *1. Klein's 2010 TOS Had Been Terminated in March 2011.*

The district court erred in finding the 2010 TOS could be modified after the contract had been terminated, and failed to analyze the consequences of the fact that the 2010 TOS had been terminated. The fact that the 2010 TOS had been

terminated before Verizon's attempt to impose arbitration is a salient fact affecting

analysis of whether the 2012 TOS could be applied retroactively to Klein's claim.

*See Verizon Advanced Data, Inc. v. Frognet, Inc.*, 2006 U.S. Dist. LEXIS 57223

(limiting application of arbitration agreement to second contract because second

contract was separate from first contract). The district court's failure to consider

the consequences of the termination of the 2010 TOS was error.

2. *The Language of the 2012 TOS Limited Its Application to the Existing TOS.*

The district court failed to consider Klein's argument that the language of

the 2012 TOS limits its own application through consistent reference to arbitration

of disputes under "this Agreement." A. 102-04 (2012 TOS §§ 14.1, 15.4, and

18.1) (multiple references to "this Agreement").[3] Indeed, all of the relevant

language in the 2012 TOS is stated in the present tense, and none of the language

in the 2012 TOS indicates retroactive application. As explained below, in the face

of multiple present tense references in the 2012 TOS, the district court relied on

_____

[3] The integration clause in Section 15.7 cannot be read to supersede contracts from prior transactions between the parties. *See Suburban Leisure Ctr., Inc. v. Amf Bowling Prods.*, 468 F.3d 523, 527 (8th Cir. 2006) (applying Virginia law and holding that a merger clause in the parties' second agreement did not supersede their first agreement because the two agreements were "collateral" and addressed different obligations); *Security Watch, Inc. v. Sentinel Sys.*, 176 F.3d 369, 372 (6th Cir. 1999) (declining to hold that merger clause in second contract superseded prior annual contracts because the purpose of a merger clause is to preclude introduction of evidence related to the current agreement) (citing 2 FARNSWORTH ON CONTRACTS § 7.3 at 215-25).

44

two phrases in the 2012 TOS to support its ruling in favor of retroactivity. This was error by the district court.

First, the district court recognized that Klein's claim arose out of the 2010 TOS. It also recognized that Klein terminated the November 2010 agreement in March of 2011. It also recognized that Klein then entered into an entirely new agreement with Verizon later in March 2011. A. 223. Therefore, the district court should also have recognized that Klein's claim does not arise out of the 2012 TOS and that as a result, Klein's claim did not arise under "this agreement" as referenced in the 2012 TOS. The district court did not address this consequence of Klein's termination of the 2010 TOS.

Second, Klein's argument that the arbitration clause only applies to disputes under the "current" 2012 TOS, not the prior one, 2010 TOS, is supported by use of the present tense ("this Agreement") throughout the 2012 TOS. Even the email notifying Klein of the new arbitration clause clearly states that the modification only applies with respect to services that the consumer is presently receiving, rather than services the customer received in the past: "If you *have* one or more of these services, the terms *now* require that you and Verizon resolve disputes only by arbitration or in small claims court." A. 84 (emphasis added). In addition, the phrase "any dispute that *arises* from or *relates* to" in section 18.1 speaks in the present tense and indicates present or future disputes. A. 104. The reference to

45

"equipment, products and services you *receive* from us" is also in the present tense. *Id.* The present tense "receive" indicates services that the customer is currently receiving under the current contract, not services that the Klein *received* under a contract that has already been terminated. Again, the district court did not address or analyze the consequence of Verizon's use of the present tense in its own 2012 TOS.

The district court based its ruling that the 2012 TOS arbitration clause applied retroactively on two sections in the Verizon 2012 TOS: 1) §15.7, stating the 2012 TOS "supersede[d] any and all prior or contemporaneous agreements whether written or oral" and 2) §18.1, applying the Federal Arbitration Act to "any dispute". A. 236-37. However, as stated above, in the same sentence of §18.1, the 2012 TOS again makes reference to "this agreement." A. 84. Although the repeated reference to "this agreement" should make Verizon's intent that the arbitration clause apply prospectively clear, at most, the references in §15.7 and §18.1 create an ambiguity, which must be construed against Verizon since it is well-settled that ambiguities in a contract will be construed against the drafter. *Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 182, 519 S.E.2d 133, 140 (1999).

The district court's approach to contract construction is a deviation from established case law in both Maryland and Virginia, which instructs that the contract must be construed as a whole and that meaning must to given to every

46

section.  *See e.g., Berry v. Klinger,* 225 Va. 201, 208, 300 S.E.2d 792, 796

(1983); *Cheney v. Bell National Life,* 315 Md. 761, 766-67, 556 A.2d 1135 (1989)

("Words are given their "customary, ordinary, and accepted meaning," unless there

is an indication that the parties intended to use the words in a technical

sense").  Again, *Hendrick, supra,* is instructive.  In *Hendrick,* the arbitration clause

was lodged in a clause which purported to cover any claim which "*relates to,*

*arises from, concerns or involves in any way . . . any other matter related to the*

*relationship between the Employee and the Company."*  Although this language

had a broader reach than the language in Verizon's contract- "any dispute that

arises from or relates to," the Court placed significance on the use of present tense

language:

> Furthermore, to the extent that the 1993 employment contract and the
> DRP contain language bespeaking the temporal reach of the
> agreement to arbitrate, *that language is forward-looking, not*
> *retroactive*. For example, the contract provides that the employee
> "will be bound" to arbitrate under the DRP. And, even the words
> which Brown & Root says sweep the pre-existing claims within the
> agreement to arbitrate ("relates to," "arises from," "concerns or
> involves") speak in the present tense or connote the future ("arises
> from"). . . Nothing in that language even implies an obligation to
> arbitrate claims accrued before the commencement of the obligation
> to arbitrate.

*Hendrick* at 535 (emphasis added).  *See also United States v. Wilson,* 503

U.S. 329, 333, 112 S.Ct. 1351, 1354, 117 L.Ed.2d 593 (1992) (construing

intent of statute by reference to verb tense); *Rensin v. Juno–Loudon,*

47

*LLC,* No. 09cv1391, 2010 WL 1381546 at *5 (E.D.Va. Mar. 30,

2010) (ruling statute must be construed according to its plain language and

relying on fact that "The statute is drafted in the present tense.").  The

district court ignored Verizon's use of the present tense and therefore, its

ruling must be overturned.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment should be reversed, and the matter

should be remanded for pretrial proceedings and trial.

Dated:  September 2, 2014                    Respectfully submitted,

<u>/s/ Raymond C. Fay</u>
Raymond C. Fay
FAY LAW GROUP PLLC
1250 Connecticut Ave., N.W.
Suite 200
Washington, D.C. 20036
Phone: (202) 263-4604
Facsimile: (202) 261-3508
rfay@faylawdc.com


*Attorneys for Jason Klein*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 14-1660-L    **Caption:** Klein v. Verizon Communications, Inc.

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains ____11,946____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   MS Word _____ [*identify word processing program*] in
   14 point Times New Roman _____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Raymond C. Fay _____

Attorney for Jason Klein _____

Dated: September 2, 2014 _____

# CERTIFICATE OF SERVICE

I certify that on <u>9/2/2014</u>    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/S/   Ray Fay, Esquire
_____
           Signature

09/02/2014
_____
           Date